PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

—————————

No. 09-3185

—————————

UNITED STATES OF AMERICA

v.

MICHAEL MARZZARELLA,
                              Appellant

—————————

On Appeal from the United States District Court
for the Western District of Pennsylvania
D.C. Criminal No. 07-cr-0024
Honorable Sean J. McLaughlin

—————————

Argued February 22, 2010
Before:  SCIRICA and CHAGARES, *Circuit Judges*,
and RODRIGUEZ[*], *District Judge*.

—————————

[*]The Honorable Joseph H. Rodriguez, United States District
Judge for the District of New Jersey, sitting by designation.

(Filed: July 29, 2010)

THOMAS W. PATTON, ESQUIRE (ARGUED)
Office of Federal Public Defender
1111 Renaissance Centre
1001 State Street
Erie, Pennsylvania 16501
        Attorney for Appellant

LAURA S. IRWIN, ESQUIRE (ARGUED)
ROBERT L. EBERHARDT, ESQUIRE
Office of the United States Attorney
700 Grant Street, Suite 4000
Pittsburgh, Pennsylvania 15219
        Attorneys for Appellee

---

OPINION OF THE COURT

---

SCIRICA, *Circuit Judge*.

This appeal presents a single issue, whether Defendant Michael Marzzarella's conviction under 18 U.S.C. § 922(k) for possession of a handgun with an obliterated serial number violates his Second Amendment right to keep and bear arms. We hold it does not and accordingly will affirm the conviction.

I.

In April 2006, the Pennsylvania State Police were notified by a confidential informant that Marzzarella was involved in the sale of stolen handguns. On April 25, the confidential informant arranged a purchase of handguns from Marzzarella. The next day, State Trooper Robert Toski, operating in an undercover capacity, accompanied the informant to Marzzarella's home in Meadville, Pennsylvania, where Toski purchased a .25 caliber Titan pistol with a partially obliterated serial number for $200. On May 16, Marzzarella sold Toski a second firearm and informed him that its serial number could be similarly obliterated.

On June 12, 2007, Marzzarella was indicted for possession of a firearm with an obliterated serial number, in violation of § 922(k).[1] No charges were brought for the sale of

---

[1] Section 922(k) provides:

> It shall be unlawful for any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered or to possess or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce.

the Titan pistol or the sale or possession of the second firearm. Marzzarella moved to dismiss the indictment, arguing § 922(k), as applied, violated his Second Amendment right to keep and bear arms, as recognized by the Supreme Court in *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008). The District Court denied the motion, holding the Second Amendment does not protect a right to own handguns with obliterated serial numbers and that § 922(k) does not meaningfully burden the "core" right recognized in *Heller*—the right to possess firearms for defense of hearth and home. Moreover, it held that because § 922(k) is designed to regulate the commercial sale of firearms and to prevent possession by a class of presumptively dangerous individuals, it is analogous to several longstanding limitations on the right to bear arms identified as presumptively valid in *Heller*. Finally, the District Court held that even if Marzzarella's possession of the Titan pistol was protected by the Second Amendment, § 922(k) would pass muster under intermediate scrutiny as a constitutionally permissible regulation of Second Amendment rights.

---

We recognize the words "removed," "obliterated," and "altered" may denote distinct actions. *See United States v. Carter*, 421 F.3d 909, 912–13 (9th Cir. 2005) (detailing the difference in the ordinary meanings of "obliterated" and "altered" in U.S.S.G. § 2K2.1(b)(4)). Because the disposition of this case does not turn on their distinctions, we use these terms, as well as the term "unmarked," interchangeably.

After the denial of the motion to dismiss the indictment, Marzzarella entered a conditional guilty plea, reserving the right to appeal the constitutionality of § 922(k). The District Court sentenced him to nine months imprisonment. Marzzarella now appeals.[2]

## II.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. To determine whether § 922(k) impermissibly burdens Marzzarella's Second Amendment rights, we begin with *Heller*.[3]

---

[2]The District Court had jurisdiction over Marzzarella's indictment under 18 U.S.C. § 3231. We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291. We exercise plenary review of a constitutional challenge to the application of a statute. *United States v. Fullmer*, 584 F.3d 132, 151 (3d Cir. 2009).

[3]The Supreme Court recently issued its decision in *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010). *McDonald* dealt primarily with the incorporation of the Second Amendment against the states, *id.* at 3050 (plurality opinion of Alito, J.), and does not alter our analysis of the scope of the right to bear arms.

5

In *Heller*, the Supreme Court struck down several District of Columbia statutes prohibiting the possession of handguns and requiring lawfully owned firearms to be kept inoperable. 128 S. Ct. at 2817–18. The Court concluded the Second Amendment "confer[s] an individual right to keep and bear arms," *id.* at 2799, at least for the core purpose of allowing law-abiding citizens to "use arms in defense of hearth and home," *id.* at 2821. Although the Court declined to fully define the scope of the right to possess firearms, it did caution that the right is not absolute. *Id.* at 2816–17 ("Like most rights, the right secured by the Second Amendment is not unlimited. . . . [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms . . . ."). But because the District of Columbia's laws prevented persons from possessing firearms even for self-defense in the home, they were unconstitutional under any form of means-end scrutiny applicable to assess the validity of limitations on constitutional rights. *Id.* at 2817–18 ("Under any of the standards of scrutiny that we have applied to enumerated constitutional rights . . . [the statutes] would fail constitutional muster." (citation and footnote omitted)).

As we read *Heller*, it suggests a two-pronged approach to Second Amendment challenges. First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. *Cf. United States v. Stevens*, 533 F.3d 218, 233 (3d Cir. 2008), *aff'd* 130 S. Ct. 1577 (recognizing the preliminary issue in a First Amendment

6

challenge is whether the speech at issue is protected or unprotected).[4] If it does not, our inquiry is complete. If it does, we evaluate the law under some form of means-end scrutiny. If the law passes muster under that standard, it is constitutional. If it fails, it is invalid.

---

[4]Because *Heller* is the first Supreme Court case addressing the scope of the individual right to bear arms, we look to other constitutional areas for guidance in evaluating Second Amendment challenges. We think the First Amendment is the natural choice. *Heller* itself repeatedly invokes the First Amendment in establishing principles governing the Second Amendment. *See, e.g.*, 128 S. Ct. at 2791–92 ("Just as the First Amendment protects modern forms of communications . . . the Second Amendment extends . . . to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." (citation omitted)); *id.* at 2799 ("Of course the right [to bear arms] was not unlimited, just as the First Amendment's right of free speech was not." (citation omitted)); *id.* at 2821 ("The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions . . . but not for the expression of extremely unpopular and wrong-headed views. The Second Amendment is no different. Like the First, it is the very *product* of an interest-balancing by the people . . . ."). We think this implies the structure of First Amendment doctrine should inform our analysis of the Second Amendment.

7

## A.

Our threshold inquiry, then, is whether § 922(k) regulates conduct that falls within the scope of the Second Amendment. In other words, we must determine whether the possession of an unmarked firearm in the home is protected by the right to bear arms. In defining the Second Amendment, the Supreme Court began by analyzing the text of the "operative clause," which provides that "the right of the people to keep and bear Arms, shall not be infringed." *Heller*, 128 S. Ct. at 2789–90. Because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," *id.* at 2821, the Court interpreted the text in light of its meaning at the time of ratification, *id.* at 2797–99. It concluded that the Second Amendment codified a pre-existing "individual right to possess and carry weapons in case of confrontation." *Id.* at 2797. The "prefatory clause"—providing "[a] well regulated Militia being necessary to the security of a Free State"—explains only the purpose for codification, *viz.*, preventing the disbandment of the militia by the federal government. *Id.* at 2801. It says nothing about the content of the right to bear arms and does not mean the right was protected solely to preserve the militia. *Id.* "[M]ost [Americans] undoubtedly thought it even more important for self-defense and hunting," and the interest in self-defense "was the *central component* of the right itself." *Id.*

8

But the right protected by the Second Amendment is not unlimited.[5]  *Id.* at 2816; *see also McDonald v. City of Chicago*,

---

[5]There is some dispute over whether the language from *Heller* limiting the scope of the Second Amendment is dicta. *Compare United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010) (characterizing this language as dicta), *petition for cert. filed*, (U.S. June 1, 2010) (09-11204), *and United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009) (Tymkovich, J., dissenting) (same), *cert. denied*, 130 S. Ct. 1686 (2010) *with United States v. Rozier*, 598 F.3d 768, 771 n.6 (11th Cir. 2010) (stating this language is not dicta), *cert. denied*, 78 U.S.L.W. 3714 (U.S. June 7, 2010), *and United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (same).  But even if dicta, it is Supreme Court dicta, and, as such, requires serious consideration.  *See Heleva v. Brooks*, 581 F.3d 187, 188 n.1 (3d Cir. 2009) ("[W]e do not view [Supreme Court] dicta lightly." (alterations in original) (internal quotation marks omitted)); *see also Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006) ("[T]here is dicta and then there is dicta, and then there is Supreme Court dicta.").  Several other courts of appeals have followed this dicta.  *See, e.g.*, *United States v. Skoien*, No. 08-3770, 2010 WL 2735747, at *3 (July 13, 2010 7th Cir.) (en banc); *United States v. White*, 593 F.3d 1199, 1205–06 (11th Cir. 2010) (extending it to cover a ban on possession by domestic violence offenders); *United States v. Rene E.*, 583 F.3d 8, 12 (1st Cir. 2009) (finding the prohibition of juvenile possession of firearms was consistent with the approach of

9

130 S. Ct. 3020, 3047 (2010) (plurality opinion of Alito, J.) (reiterating the limited nature of the right to bear arms). First, it does not extend to all types of weapons, only to those typically possessed by law-abiding citizens for lawful purposes. *Id.* at 2815–16 (interpreting *United States v. Miller*, 307 U.S. 174 (1939)). In *Miller*, the Supreme Court reversed the dismissal of an indictment of two men for transporting an unregistered short-barreled shotgun in interstate commerce, in violation of then 26 U.S.C. § 1332(c) and (d). 307 U.S. at 175. The Court held the shotgun was unprotected by the Second Amendment. *Id.* at 178. In *Heller*, the Court explained that "*Miller* stands only for the proposition that the Second Amendment right, whatever its nature, extends only to certain types of weapons," 128 S. Ct. at 2814—those commonly owned by law-abiding citizens, *id.* at 2815–16. This proposition reflected a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 2817. Accordingly, the right to bear arms, as codified in

*Heller*'s dicta), *cert. denied*, 130 S. Ct. 1109 (2010); *McCane*, 573 F.3d at 1047 (relying solely on this dicta to conclude a ban on possession of firearms by felons did not offend the Second Amendment); *United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009), *cert. denied*, 129 S. Ct. 2814 (2009); *United States v. Fincher*, 538 F.3d 868, 873-74 (8th Cir. 2008) (upholding a ban on machine guns), *cert. denied*, 129 S. Ct. 1369 (2009). Moreover, the Court itself reaffirmed the presence of these limitations in *McDonald*. 130 S.Ct. at 3047 (plurality opinion of Alito, J.).

the Second Amendment, affords no protection to "weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 2815–16.

Moreover, the Court identified several other valid limitations on the right similarly derived from historical prohibitions. *Id.* at 2816–17.

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* The Court explained that this list of "presumptively lawful regulatory measures" was merely exemplary and not exhaustive. *Id.* at 2817 n.26.

We recognize the phrase "presumptively lawful" could have different meanings under newly enunciated Second Amendment doctrine. On the one hand, this language could be read to suggest the identified restrictions are presumptively lawful because they regulate conduct outside the scope of the Second Amendment. On the other hand, it may suggest the restrictions are presumptively lawful because they pass muster

11

under any standard of scrutiny. Both readings are reasonable interpretations, but we think the better reading, based on the text and the structure of *Heller*, is the former—in other words, that these longstanding limitations are exceptions to the right to bear arms.[6] Immediately following the above-quoted passage, the Court discussed "another important limitation" on the Second Amendment—restrictions on the types of weapons individuals may possess. *Heller*, 128 S. Ct. at 2817. The Court made clear that restrictions on the possession of dangerous and unusual weapons are not constitutionally suspect because these weapons are outside the ambit of the amendment. *Id.* at 2815–16 ("[T]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes . . . ."). By equating the list of presumptively lawful regulations with restrictions on dangerous and unusual weapons, we believe the Court intended to treat them equivalently—as exceptions to the Second Amendment guarantee.

This reading is also consistent with the historical approach *Heller* used to define the scope of the right. If the Second Amendment codified a pre-existing right to bear arms, *id.* at 2797, it codified the pre-ratification understanding of that

---

[6] *See* Joseph Blocher, *Categoricalism and Balancing in First and Second Amendment Analysis*, 84 N.Y.U. L. Rev. 375, 413 (2009) ("*Heller* categorically excludes certain types of 'people' and 'Arms' from Second Amendment coverage, denying them any constitutional protection whatsoever.").

12

right, *id.* at 2821 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them . . . ."). Therefore, if the right to bear arms as commonly understood at the time of ratification did not bar restrictions on possession by felons or the mentally ill, it follows that by constitutionalizing this understanding, the Second Amendment carved out these limitations from the right. Moreover, the specific language chosen by the Court refers to "prohibitions" on the possession of firearms by felons and the mentally ill. *Id.* at 2816–17. The endorsement of prohibitions as opposed to regulations, whose validity would turn on the presence or absence of certain circumstances, suggests felons and the mentally ill are disqualified from exercising their Second Amendment rights.[7] The same is true for "laws forbidding the carrying of firearms in sensitive places."[8] *Heller*, 128 S. Ct. at

---

[7]*See* Blocher, *supra* note 5, at 414 (reading this language to stand for the proposition that "felons and the mentally ill, however defined, are excluded entirely from Second Amendment coverage").

[8]Commercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment under this reading. *Heller* endorsed "laws imposing conditions and qualifications on the commercial sale of firearms." 128 S. Ct. at 2817. In order to uphold the constitutionality of a law imposing a condition on the commercial sale of firearms, a court necessarily must examine the nature and extent of the imposed condition. If there

13

2817.

Accordingly, *Heller* delineates some of the boundaries of the Second Amendment right to bear arms.[9]  At its core, the Second Amendment protects the right of law-abiding citizens to possess non-dangerous[10] weapons for self-defense in the home. *Id.* at 2821 ("[W]hatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.").  And certainly, to some degree, it must protect the right of law-abiding citizens to possess firearms for other, as-yet-undefined, lawful purposes. *See, e.g.*, *id.* at 2801 (discussing hunting's importance to the pre-ratification conception of the right); *id.* (discussing the right to bear arms as a bulwark against potential governmental oppression).  The right is not unlimited, however, as the Second

---

were somehow a categorical exception for these restrictions, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms.  Such a result would be untenable under *Heller*.

[9]*McDonald* concerns primarily the incorporation of the Second Amendment; its discussion of the scope of the right to bear arms is coextensive with *Heller*'s.

[10]By "non-dangerous weapons," we refer to weapons that do not trigger *Miller*'s exception for dangerous and unusual weapons.

14

Amendment affords no protection for the possession of dangerous and unusual weapons, possession by felons and the mentally ill, and the carrying of weapons in certain sensitive places. *Id.* at 2816–17.

But *Heller* did not purport to fully define all the contours of the Second Amendment, *id.* at 2816 ("[W]e do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment . . . ."), and accordingly, much of the scope of the right remains unsettled. While the Second Amendment clearly protects possession for certain lawful purposes, it is not the case that all possession for these purposes is protected conduct. For example, although the Second Amendment protects the individual right to possess firearms for defense of hearth and home, *Heller* suggests, and many of our sister circuits have held, a felony conviction disqualifies an individual from asserting that interest. *See* 128 S. Ct. at 2816–17; *United States v. Rozier*, 598 F.3d 768, 770 (11th Cir. 2010) ("We find 18 U.S.C. § 922(g)(1) to be constitutional, even if a felon possesses a firearm purely for self-defense."), *cert. denied*, 78 U.S.L.W. 3714 (U.S. June 7, 2010); *see also United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010); *United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009), *cert. denied*, 129 S. Ct. 2814 (2009). This is so, even if a felon arguably possesses just as strong an interest in defending himself and his home as any law-abiding individual.

Moreover, *Heller*'s list of presumptively lawful regulations is not exhaustive, 128 S. Ct. at 2817 n.26, and

15

accordingly, the Second Amendment appears to leave intact additional classes of restrictions. But the approach for identifying these additional restrictions is also unsettled. *Heller*'s identified exceptions all derived from historical regulations, but it is not clear that pre-ratification presence is the only avenue to a categorical exception. For example, does 18 U.S.C. § 922(g)(3)'s prohibition of possession by substance abusers violate the Second Amendment because no restrictions on possession by substance abusers existed at the time of ratification? Or is it valid because it presumably serves the same purpose as restrictions on possession by felons—preventing possession by presumptively dangerous individuals? *See Scarborough v. United States*, 431 U.S. 563, 572 (1977) ("[By prohibiting possession by felons,] Congress sought to rule broadly—to keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." (internal quotation marks omitted)); *United States v. Cheeseman*, 600 F.3d 270, 280 (3d Cir. 2010) (noting, in a criminal forfeiture action, that congressional intent in passing § 922(g)(3) was "to keep firearms out of the possession of drug abusers, a dangerous class of individuals"), *petition for cert. filed*, 78 U.S.L.W. 3731 (U.S. June 1, 2010) (No. 09-1470). Therefore, prudence counsels caution when extending these recognized exceptions to novel regulations unmentioned by *Heller*. *Cf. Stevens*, 533 F.3d at 225 (counseling restraint when extending the logic of categorical exceptions for unprotected speech to new types of speech).

16

Section 922(k)'s prohibition of the possession of firearms with "removed, obliterated, or altered" serial numbers is one of those regulations unmentioned by *Heller*. Marzzarella argues § 922(k) is unconstitutional because the Second Amendment categorically protects the right to possess unmarked firearms. *Heller* defined the Second Amendment by looking to what the right meant at the time of ratification. 128 S. Ct. at 2798–99. Because the Second Amendment protects weapons "of the kind in common use at the time," *id.* at 2815 (quoting *Miller*, 307 U.S. at 179), it must, says Marzzarella, protect firearms in common use at the time of ratification. He alleges that firearms in common use in 1791 did not possess serial numbers. Accordingly, he contends the Second Amendment must protect firearms without serial numbers.

We are not persuaded by Marzzarella's historical syllogism. His argument rests on the conception of unmarked firearms as a constitutionally recognized class of firearms, in much the same way handguns constitute a class of firearms. That premise is unavailing. *Heller* cautions against using such a historically fact-bound approach when defining the types of weapons within the scope of the right. 128 S. Ct. at 2791 ("Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way."). Moreover, Marzzarella himself asserts that serial numbers on firearms did not exist at the time

17

of ratification.[11]  Accordingly, they would not be within the contemplation of the pre-existing right codified by the Second Amendment.  It would make little sense to categorically protect a class of weapons bearing a certain characteristic when, at the time of ratification, citizens had no concept of that characteristic or how it fit within the right to bear arms.

Furthermore, it also would make little sense to categorically protect a class of weapons bearing a certain characteristic wholly unrelated to their utility.  *Heller* distinguished handguns from other classes of firearms, such as long guns, by looking to their functionality.  *Id.* at 2818 (citing handguns' ease in storage, access, and use in case of confrontation).  But unmarked firearms are functionally no different from marked firearms.  The mere fact that some firearms possess a nonfunctional characteristic should not create

---

[11]Marzzarella does not cite to any source for this assertion, but it appears that serial numbers arose only with the advent of mass production of firearms.  *See* Thomas Henshaw, The History of Winchester Firearms 1866–1992, at ix (6th ed. 1993) (listing the first recorded serial number on a Winchester firearm as appearing in 1866); National Park Service, U.S. Department of the Interior, Springfield Armory National Historic Site — M1865–88 rifles, http://www.nps.gov/spar/historyculture/m1865-88-rifles.htm (last visited July 8, 2010) (stating that no serial numbers appeared on Springfield Armory weapons until 1868).

18

a categorically protected class of firearms on the basis of that characteristic.

Although there is no categorical protection for unmarked firearms, Marzzarella's conduct may still fall within the Second Amendment because his possession of the Titan pistol in his home implicates his interest in the defense of hearth and home—the core protection of the Second Amendment. While the burden on his ability to defend himself is not as heavy as the one involved in *Heller*, infringements on protected rights can be, depending on the facts, as constitutionally suspect as outright bans. *See United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 812 (2000) ("It is of no moment that the statute does not impose a complete prohibition. The distinction between laws burdening and laws banning speech is but a matter of degree."). Marzzarella contends that by preventing him from possessing this particular handgun in his home, § 922(k) unconstitutionally limited his ability to defend himself.[12]

We are skeptical of Marzzarella's argument that possession in the home is conclusive proof that § 922(k) regulates protected conduct. Because the presence of a serial

_____

[12]The Government argues Marzzarella did not possess the firearm for self-defense purposes because he intended to sell it to Toski. But the Government elected to indict Marzzarella only for possession of the handgun, not the sale. If he possessed the pistol for self-defense purposes, its subsequent sale would not somehow retroactively eliminate that interest.

19

number does not impair the use or functioning of a weapon in any way, the burden on Marzzarella's ability to defend himself is arguably *de minimis*. Section 922(k) did not bar Marzzarella from possessing any otherwise lawful marked firearm for the purpose of self-defense, and a person is just as capable of defending himself with a marked firearm as with an unmarked firearm. With or without a serial number, a pistol is still a pistol. Furthermore, it cannot be the case that possession of a firearm in the home for self-defense is a protected form of possession under all circumstances. By this rationale, any type of firearm possessed in the home would be protected merely because it could be used for self-defense. Possession of machine guns or short-barreled shotguns—or any other dangerous and unusual weapon—so long as they were kept in the home, would then fall within the Second Amendment. But the Supreme Court has made clear the Second Amendment does not protect those types of weapons. *See Miller*, 307 U.S. at 178 (holding that short-barreled shotguns are unprotected); *see also United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008) ("Machine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use."), *cert. denied*, 129 S. Ct. 1369 (2009).

It is arguably possible to extend the exception for dangerous and unusual weapons to cover unmarked firearms. "[T]he Second Amendment does not protect those weapons not

typically possessed by law-abiding citizens for lawful purposes
. . . .” *Heller*, 128 S. Ct. at 2815–16. The District Court could
not identify, and Marzzarella does not assert, any lawful purpose
served by obliterating a serial number on a firearm. Because a
firearm with a serial number is equally effective as a firearm
without one, there would appear to be no compelling reason why
a law-abiding citizen would prefer an unmarked firearm. These
weapons would then have value primarily for persons seeking to
use them for illicit purposes. *See United States v. Carter*, 421
F.3d 909, 910 (9th Cir. 2005) (noting that unmarked firearms
have a “greater flexibility to be utilized in illicit activities”
(alteration and internal quotation marks omitted)); *cf. United
States v. Tagg*, 572 F.3d 1320, 1326 (11th Cir. 2009) (finding no
Second Amendment protection for pipe bombs because they
could not be used for legitimate lawful purposes); *State v.
Chandler*, 5 La. Ann. 489, 489–90 (1850) (holding concealed
weapons could be prohibited because of their tendency to be
used in violent crimes on unsuspecting victims). Nevertheless,
a handgun with an obliterated serial number seems distinct from
a weapon like a short-barreled shotgun. While a short-barreled
shotgun is dangerous and unusual in that its concealability
fosters its use in illicit activity, it is also dangerous and unusual
because of its heightened capability to cause damage. *See
United States v. Amos*, 501 F.3d 524, 532 (6th Cir. 2007)
(McKeague, J., dissenting) (“With its shorter barrel, a sawed-off
shotgun can be concealed under a large shirt or coat. It is the
combination of low, somewhat indiscriminate accuracy, large
destructive power, and the ability to conceal that makes a

21

sawed-off shotgun useful for only violence against another person . . . ."); *see also United States v. Upton*, 512 F.3d 394, 404 (7th Cir. 2008) (likening sawed-off shotguns to "other dangerous weapons like bazookas, mortars, pipe bombs, and machine guns"). An unmarked firearm, on the other hand, is no more damaging than a marked firearm.

Accordingly, while the Government argues that § 922(k) does not impair any Second Amendment rights, we cannot be certain that the possession of unmarked firearms in the home is excluded from the right to bear arms. Because we conclude § 922(k) would pass constitutional muster even if it burdens protected conduct, we need not decide whether Marzzarella's right to bear arms was infringed.

B.

Assuming § 922(k) burdens Marzzarella's Second Amendment rights, we evaluate the law under the appropriate standard of constitutional scrutiny. *Heller* did not prescribe the standard applicable to the District of Columbia's handgun ban. 128 S. Ct. at 2817–18. Instead, it held that "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights [the ban] . . . would fail constitutional muster." *Id.* (footnote omitted).

22

The Government argues a rational basis test[13] should apply to § 922(k), but *Heller* rejects that standard for laws burdening Second Amendment rights. *Id.* at 2816 n.27. The Court noted that even a law as burdensome as the District of Columbia's handgun ban would be constitutional under a rational basis test. *Id.* The fact that the ban was struck down, therefore, indicates some form of heightened scrutiny must have applied. Moreover, "[i]f all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect." *Id.*

Marzzarella, on the other hand, contends we must apply strict scrutiny[14] because the right to bear arms is an enumerated fundamental constitutional right. *See McDonald*, 130 S. Ct. at 3050 (plurality opinion of Alito, J.). Whether or not strict scrutiny may apply to particular Second Amendment challenges, it is not the case that it must be applied to all Second Amendment challenges. Strict scrutiny does not apply

---

[13]A rational basis test presumes the law is valid and asks only whether the statute is rationally related to a legitimate state interest. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

[14]Strict scrutiny asks whether the law is narrowly tailored to serve a compelling government interest. *Playboy Entm't Group*, 529 U.S. at 813.

23

automatically any time an enumerated right is involved. We do not treat First Amendment challenges that way.[15] Strict scrutiny is triggered by content-based restrictions on speech in a public forum, *see Pleasant Grove City v. Summum*, 129 S. Ct. 1125, 1132 (2009), but content-neutral time, place, and manner restrictions in a public forum trigger a form of intermediate scrutiny, *see Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (upholding such restrictions if they "are justified without reference to the content of the regulated speech, . . . they are narrowly tailored to serve a significant governmental interest, and . . . they leave open ample alternative channels for communication of the information." (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984))). Regulations on nonmisleading commercial speech trigger another form of intermediate scrutiny, *see Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980) (requiring the regulation to directly advance a substantial governmental interest and not be more burdensome than necessary to serve that interest), whereas disclosure requirements for commercial speech trigger a rational basis test, *see Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985) ("We do not suggest that disclosure requirements do not implicate the advertiser's

---

[15]While we recognize the First Amendment is a useful tool in interpreting the Second Amendment, we are also cognizant that the precise standards of scrutiny and how they apply may differ under the Second Amendment.

First Amendment rights at all. . . . But we hold that an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers."). In sum, the right to free speech, an undeniably enumerated fundamental right, *see W. Va. State Bd. of Educ. v. Barnett*e, 319 U.S. 624, 638 (1943), is susceptible to several standards of scrutiny, depending upon the type of law challenged and the type of speech at issue. We see no reason why the Second Amendment would be any different.

If the Second Amendment can trigger more than one particular standard of scrutiny, § 922(k) should merit a less stringent standard than the one that would have applied to the District of Columbia's handgun ban. While it is not free from doubt, we think this means that § 922(k) should be evaluated under intermediate scrutiny. The burden imposed by the law does not severely limit the possession of firearms. The District of Columbia's handgun ban is an example of a law at the far end of the spectrum of infringement on protected Second Amendment rights. *Heller*, 128 S. Ct. at 2818 ("Few laws in the history of our Nation have come close to the severe restriction of the District's handgun ban."). It did not just regulate possession of handguns; it prohibited it, even for the stated fundamental interest protected by the right—the defense of hearth and home. *Id.* But § 922(k) does not come close to this level of infringement. It leaves a person free to possess any otherwise lawful firearm he chooses—so long as it bears its original serial number.

25

Furthermore, the legislative intent behind § 922(k) was not to limit the ability of persons to possess any class of firearms. While the intent of the District of Columbia's ban was to prevent the possession of handguns, § 922(k) permits possession of all otherwise lawful firearms. As Congress indicated with respect to the Omnibus Crime Control and Safe Streets Act of 1968—which included § 922(k)'s predecessor:

> It is not the purpose of the title to place any undue or unnecessary restrictions or burdens on responsible, law-abiding citizens with respect to the acquisition, possession, transporting, or use of firearms appropriate to . . . personal protection, or any other lawful activity. The title is not intended to discourage or eliminate the private ownership of such firearms by law-abiding citizens for lawful purposes . . . .

S. Rep. 90-1097, at 28 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2114. Section 922(k) is designed to prohibit possession of only unmarked firearms, while leaving the possession of marked firearms untouched.

Because § 922(k) was neither designed to nor has the effect of prohibiting the possession of any class of firearms, it is more accurately characterized as a regulation of the manner in which persons may lawfully exercise their Second Amendment rights. The distinction between limitations on the exercise of protected conduct and regulation of the form in

26

which that conduct occurs also appears in the First Amendment context. Discrimination against particular messages in a public forum is subject to the most exacting scrutiny. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994). Regulations of the manner in which that speech takes place, however, receive intermediate scrutiny, under the time, place, and manner doctrine. *See Ward*, 491 U.S. at 791. Accordingly, we think § 922(k) also should merit intermediate, rather than strict, scrutiny.

In the First Amendment speech context, intermediate scrutiny is articulated in several different forms. *See Turner Broad. Sys.*, 512 U.S. at 662 (requiring the regulation serve "an important or substantial" interest and not "burden substantially more speech than is necessary" to further that interest (internal quotation marks omitted)); *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (requiring a "substantial" governmental goal and a "reasonable fit" between the regulation and that objective); *Ward*, 491 U.S. at 791 (applying the time, place, and manner standard which asks whether the regulation is narrowly tailored to serve a significant governmental interest and leaves open ample alternative channels of communication); *Cent. Hudson*, 447 U.S. at 566 (requiring the regulation directly advance a substantial interest and be no more extensive than necessary to serve the interest). Although these standards differ in precise terminology, they essentially share the same substantive requirements. They all require the asserted governmental end to be more than just legitimate, either

27

"significant," "substantial," or "important." *See, e.g.*, *Turner Broad Sys.*, 512 U.S. at 662; *Ward*, 491 U.S. at 791. They generally require the fit between the challenged regulation and the asserted objective be reasonable, not perfect. *See, e.g.*, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001); *Fox*, 492 U.S. at 480. The regulation need not be the least restrictive means of serving the interest, *see, e.g.*, *Turner Broad. Sys.*, 512 U.S. at 662; *Ward*, 491 U.S. at 798, but may not burden more speech than is reasonably necessary, *see, e.g.*, *Turner Broad. Sys.*, 512 U.S. at 662; *Ward*, 491 U.S. at 800.

Those requirements are met here. First, we think it plain that § 922(k) serves a law enforcement interest in enabling the tracing of weapons via their serial numbers. Section 922(k) was enacted by the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, 1221.[16] The objective of this Act was "to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218 (1976). The goal of § 922(k), in particular, is to assist law enforcement by making it possible to use the serial number of a firearm recovered in a crime to trace and identify its owner and source. *See United States v. Adams*, 305 F.3d 30, 34 (1st Cir. 2002) ("[A]nyone can see what Congress was getting at in the statute. . . . [T]he statute aims to punish one who possesses a firearm whose principal means of

---

[16]This restriction was originally enacted by the Federal Firearms Act of 1938, Pub. L. No. 75-785, 52 Stat. 1250, 1251.

tracing origin and transfers in ownership—its serial number—has been deleted or made appreciably more difficult to make out."); *United States v. Mobley*, 956 F.2d 450, 454 (3d Cir. 1992) ("It is no secret that a chain of custody for a firearm greatly assists in the difficult process of solving crimes. When a firearm is stolen, determining this chain is difficult and when serial numbers are obliterated, it is virtually impossible."). Firearms without serial numbers are of particular value to those engaged in illicit activity because the absence of serial numbers helps shield recovered firearms and their possessors from identification. *See Carter*, 421 F.3d at 910. Their prevalence, therefore, makes it more difficult for law enforcement to gather information on firearms recovered in crimes. Accordingly, preserving the ability of law enforcement to conduct serial number tracing—effectuated by limiting the availability of untraceable firearms—constitutes a substantial or important interest.

Section 922(k) also fits reasonably with that interest in that it reaches only conduct creating a substantial risk of rendering a firearm untraceable. Because unmarked weapons are functionally no different from marked weapons, § 922(k) does not limit the possession of any class of firearms. Moreover, because we, like the District Court, cannot conceive of a lawful purpose for which a person would prefer an unmarked firearm, the burden will almost always fall only on those intending to engage in illicit behavior. Regulating the possession of unmarked firearms—and no other

29

firearms—therefore fits closely with the interest in ensuring the traceability of weapons. Accordingly, § 922(k) passes muster under intermediate scrutiny.

Although we apply intermediate scrutiny, we conclude that even if strict scrutiny were to apply to § 922(k), the statute still would pass muster. For a law to pass muster under strict scrutiny, it must be "narrowly tailored to serve a compelling state interest." *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 465 (2007). We presume the law is invalid, and the government bears the burden of rebutting that presumption. *Playboy Entm't Group*, 529 U.S. at 817.

While First Amendment jurisprudence has articulated a comprehensive doctrine around what can and cannot be a compelling interest for restrictions on speech, *see, e.g.*, Eugene Volokh, *Freedom of Speech, Permissible Tailoring and Transcending Strict Scrutiny*, 144 U. Pa. L. Rev. 2417, 2419–21 (1996), Second Amendment jurisprudence is not yet so developed. As we discussed above, serial number tracing serves a governmental interest in enabling law enforcement to gather vital information from recovered firearms. Because it assists law enforcement in this manner, we find its preservation is not only a substantial but a compelling interest. *See United States v. Salerno*, 481 U.S. 739, 749 (1987) (holding that the government interest in preventing crime is compelling).

Marzzarella would have us conclude that serial number tracing is not a genuine compelling interest because current

federal law does not mandate an intensive enough registration and tracing system to always provide a picture of the entire chain of custody of a recovered firearm. If a regulation fails to cover a substantial amount of conduct implicating the asserted compelling interest, its underinclusiveness can be evidence that the interest is not significant enough to justify the regulation. *See Carey v. Brown*, 447 U.S. 455, 465 (1980); *see also Fla. Star v. B.J.F.*, 491 U.S. 524, 541–42 (1989) (Scalia, J., concurring) ("[A] law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." (citation and internal quotations marks omitted)). As Marzzarella points out, firearms are normally traceable only to the first retail purchaser.[17] Because private sellers are not required to record their sales, firearms sold secondhand generally cannot be tracked by serial number.[18] Moreover, even federally licensed

---

[17]*See* Department of the Treasury, Bureau of Alcohol, Tobacco & Firearms, *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers* x (2000), *available at* http://www.mayorsagainstillegalguns.org/downloads/pdf/Following_the_Gun%202000.pdf. Although the ATF report *Following the Gun* does not appear in the record, Marzzarella cites to it in his opening brief. We consider its use unobjectionable.

[18]*See id.* at 17 (referring to firearms sold secondhand as "untraceable").

31

dealers, who must record their sales, are only required to keep these records for twenty years, not in perpetuity. 27 C.F.R. § 478.129(e). The absence of a more comprehensive recordation scheme means the serial number tracing of a recovered firearm generally does not permit law enforcement agencies to follow the firearm through every transfer from the initial retail sale to the end user. Marzzarella argues this renders § 922(k) fatally underinclusive.

We see no reason to view serial number tracing so narrowly. The direct tracing of the chain of custody of firearms involved in crimes is one useful means by which serial numbers assist law enforcement.[19] But serial number tracing also provides agencies with vital criminology statistics—including a detailed picture of the geographical source areas for firearms trafficking and "time-to-crime" statistics which measure the time between a firearm's initial retail sale and its recovery in a crime[20]—as well as allowing for the identification of individual

_____

[19]*See Following the Gun*, *supra* note 17, at 44 ("[T]racing was used as an investigative tool to gain information on recovered crime guns in 60 percent of the investigations . . . .").

[20]The reporting of trace data by the ATF has been partially restricted by the Tiahrt Amendments to federal appropriations bills, Pub. L. No. 111-8, 123 Stat. 524, 575 (2009) (codified as Note to 18 U.S.C. § 923). Currently, the restriction prevents the ATF from publicly disclosing trace data, and precludes the data

32

dealers involved in the trafficking of firearms and the matching of ballistics data with recovered firearms.[21]  Section 922(k), therefore, "demonstrate[s] [Congress's] commitment to advancing" the compelling interest of preserving serial number tracing.  *Fla. Star*, 491 U.S. at 540.

Section 922(k) must also be narrowly tailored to serve that interest.  Narrow tailoring requires that the regulation actually advance the compelling interest it is designed to serve.  *See Eu v. S.F. County Democratic Cent. Comm.*, 489 U.S. 214, 226 (1989).  The law must be the least-restrictive method of serving that interest, and the burdening of a significant amount of protected conduct not implicating the interest is evidence the regulation is insufficiently tailored.  *See Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).  Section 922(k) restricts possession only of weapons which have been made less susceptible to tracing. Because it does not limit the possession of any otherwise lawful firearm, it does not burden more possession than necessary to protect the interest in serial number tracing.

Marzzarella argues § 922(k) is overinclusive and, therefore, fails narrow tailoring. Because in certain cases—such as Marzzarella's—it is possible through laboratory procedures

---

from being disclosed or used in any civil action.  *Id.*  It does not restrict the reporting of this data to law enforcement agencies. *Id.*

[21]*See Following the Gun*, *supra* note 17, at 41–44.

to discern the original serial number of a firearm despite efforts to remove, obliterate, or alter it, he contends § 922(k) goes further than is required. Presumably, Marzzarella believes the overinclusiveness could be cured by applying § 922(k) only where, upon recovery of the firearm and subsequent laboratory testing, the serial number still cannot be read.[22] But we do not think the fact that, in some cases, ex post circumstances can allow for the deciphering of a serial number renders § 922(k) insufficiently tailored. The statute protects the compelling interest of tracing firearms by discouraging the possession and use of firearms that are harder or impossible to trace. It does this by criminalizing the possession of firearms which have been altered to make them harder or impossible to trace. That these actions sometimes fail does not make the statute any less properly designed to remedy the problem of untraceable firearms. Accordingly, we find § 922(k) is narrowly tailored.

## III.

Second Amendment doctrine remains in its nascency, and

---

[22]We have our doubts about the administrability of such a standard. For starters, how much effort by law enforcement agencies would be required before courts could determine the serial number was unreadable? Moreover, the standard would provide uneven deterrence because persons would be unaware at the time of commission whether their conduct would lead to criminal liability or not. Section 922(k), read in this manner, would likely be difficult to apply.

34

lower courts must proceed deliberately when addressing regulations unmentioned by *Heller*. Accordingly, we hesitate to say Marzzarella's possession of an unmarked firearm in his home is unprotected conduct. But because § 922(k) would pass muster under either intermediate scrutiny or strict scrutiny, Marzzarella's conviction must stand.

For the foregoing reasons, we will affirm the District Court's denial of Marzzarella's motion to dismiss the indictment and affirm his judgment of conviction and sentence.